[No. 31413. *En Banc.* May 18, 1951.]

DONALD SNOWDEN, *by Richard A. Snowden, as Guardian ad Litem, Respondent,* v. KITTITAS COUNTY SCHOOL DISTRICT NO. 401, *Appellant.*[1]

*George H. Bovingdon, Henry Wager,* and *W. R. Cole,* for appellant.

*Kern & Dano,* for respondent.

[1]Reported in 231 P. (2d) 621.

HAMLEY, J.—Plaintiff, through his guardian *ad litem*, brought this suit to recover damages for personal injuries sustained when a baseball backstop fell on him while he was crossing a school playfield. The jury returned a verdict for the plaintiff in the sum of $5,898.40. Judgment was entered accordingly, and defendant has appealed.

The facts, in so far as they are pertinent to the issues discussed in this opinion, may be summarized as follows: The respondent, Donald Snowden, at the time of the accident on March 7, 1947, was six years of age. He resided with his parents within the geographical limits of appellant school district. He attended the kindergarten class of the College elementary school. This is an elementary school operated and maintained pursuant to arrangements between the Central College of Education and appellant school district.

On the morning of the day in question, Donald's mother had come to visit the school. At approximately 11:00 a. m., Donald was released from that day's classes. Donald and his mother then left the school to go to their car which was parked across the street. Donald proceeded ahead of his mother directly toward the parked vehicle. His path to the vehicle led across the corner of a playfield which was used by the pupils of the school.

The sixth grade pupils had been playing baseball on the field during a recess period which had just ended. They had left standing on this corner of the field an old baseball backstop. The sixth grade boys had lifted it from the ground to an upright position to keep the balls from going past the catcher. The backstop was made of lumber and wire, and was approximately nine feet wide and seven feet high. The students had been warned not to use the backstop because it had not been repaired following the winter of disuse, and its supports were rotten and weak. The sixth grade teacher was not on the playground at the time the backstop was raised.

As Donald proceeded past the backstop, it suddenly collapsed and fell on him, causing serious injuries.

Appellant, by means of a demurrer, motion for nonsuit, motion for directed verdict, proposed peremptory instruction, and motion for judgment notwithstanding the verdict, asserted before the trial court that the action was barred by Rem. Rev. Stat., § 4706 [P.P.C. § 862-1]. The trial court's actions in overruling the demurrer, rejecting the proposed instruction, and denying the motions, are assigned as error.

Rem. Rev. Stat., § 4706, relied upon by appellant, reads as follows:

"No action shall be brought or maintained against any school district or its officers for any noncontractual acts or omission of such district, its agents, officers or employees, relating to any park, playground, or field house, athletic apparatus or appliance, or manual training equipment, whether situated in or about any schoolhouse or elsewhere, owned, operated or maintained by such school district."

■ It is a general common-law rule that a municipal corporation is not liable to answer for the personal torts of its officers, agents or employees, in the absence of a statute expressly declaring it so liable. *Shimada v. Diking Dist. No. 12*, 139 Wash. 168, 245 Pac. 916. This rule applies to school districts. *Howard v. Tacoma School Dist. No. 10*, 88 Wash. 167, 152 Pac. 1004, Ann. Cas. 1917D, 792; *Bush v. Quinault School Dist. No. 97*, 1 Wn. (2d) 28, 95 P. (2d) 33; *Casper v. Longview School Dist. No. 122*, 5 Wn. (2d) 403, 105 P. (2d) 503; *Read v. School Dist. No. 211*, 7 Wn. (2d) 502, 110 P. (2d) 179; *Briscoe v. School Dist. No. 123*, 32 Wn. (2d) 353, 201 P. (2d) 697.

■ In this state, the rule was abrogated with respect to school districts and certain other public corporations by the enactment in 1869 of Rem. Rev. Stat., § 951 [P.P.C. § 88-3]. *Redfield v. School Dist. No. 3*, 48 Wash. 85, 92 Pac. 770; *Howard v. Tacoma School Dist. No. 10, supra*; *Stovall v. Toppenish School Dist. No. 49*, 110 Wash. 97, 188 Pac. 12, 9 A. L. R. 908; *Morris v. Union High School Dist. A*, 160 Wash. 121, 294 Pac. 998; *Briscoe v. School Dist. No. 123, supra*. This statute, in turn, was, by necessary implication, amended by the enactment in 1917 of Rem. Rev. Stat., § 4706 (Laws of 1917, chapter 92, p. 332), quoted above.

*Swanson v. School Dist. No. 15,* 109 Wash. 652, 187 Pac. 386; *Stovall v. Toppenish School Dist. No. 49, supra; Read v. School Dist. No. 211, supra; Briscoe v. School Dist. No. 123, supra.* The effect of Rem. Rev. Stat., § 4706, therefore, is to restore, in part, the common law immunity from tort liability, enjoyed by public school districts.

This immunity has been applied, and school districts have been exonerated from liability, in four cases involving school athletic activities, which have reached this court since enactment of Rem. Rev. Stat., § 4706. See *Foley v. Pierce County School Dist. No. 10,* 102 Wash. 50, 172 Pac. 819 (swimming pool); *Bailey v. School Dist. No. 49,* 108 Wash. 612, 185 Pac. 810 (swings); *Bush v. Quinault School Dist. No. 97, supra* (exercise bars); and *Yarnell v. Marshall School Dist. No. 343,* 17 Wn. (2d) 284, 135 P. (2d) 317 (swing).

Respondent advances two reasons why Rem. Rev. Stat., § 4706, should not be considered as barring recovery in the instant case. The first of these is that the baseball back-stop which caused respondent's injuries is not an "athletic apparatus" or "appliance," within the meaning of that statute. Respondent argues that the backstop had the function of protecting passersby from injury from the ball in play, the same as a screen in front of a baseball pavilion. Respondent points out that the backstop is not something used to exercise upon, such as a swing, a slide, or a chinning bar. *Juntila v. Everett School Dist. No. 24,* 178 Wash. 637, 35 P. (2d) 78, and *Briscoe v. School Dist. No. 123, supra,* are cited in support of respondent's contention.

In the *Juntila* case, a student was injured when a guard rail gave way while he was sitting in school bleachers watching a football game. This court held that a bleacher seat is not an athletic apparatus or appliance, saying:

"Athletic apparatus, appliances and manual training equipment are all things pertaining to the activities of those engaged in physical training or exercise, and they can have no reference to seats provided for mere spectators who assemble to view the activities upon the athletic field." (p. 641.)

The *Briscoe* case involved a school boy who was injured on the school grounds while playing "keep-away" with a football. In holding that a football is not an athletic apparatus or appliance, we said:

"In making a determination of this question, we note, first, that in a broad, general sense, a football might be considered to be an athletic apparatus or appliance. When, however, the relation of the words used, as to each other, and the text of the statute as a whole are carefully studied, we think that the most reasonable interpretation of what the legislature intended by the words 'athletic apparatus or appliance' is that it had reference to some sort of more or less permanently located equipment, such as swings, slides, traveling rings, teeter boards, chinning bars, etc., and not something as highly mobile as a football. The words 'situated,' 'operated,' and 'maintained,' as they are used in the statute in reference to 'athletic apparatus or appliance,' lend credence to this interpretation, for it is certainly incorrect to refer to a football as being *situated* in or about any schoolhouse *or elsewhere, owned, operated or maintained* by such school district.'" (p. 365.)

In our view, neither of these cases supports respondent's position. The baseball backstop here in question may have incidentally served to protect some passersby from injury. The principal purpose of this device, however, was to serve as a convenience to the boys who were playing baseball, so that they would not have to run after the ball in case it was missed by the catcher or fouled by the batter. One of the boys who helped raise this backstop on the day in question testified that this was done "because the balls kept going past the catcher."

The backstop, unlike the bleacher seats, was not wholly for the use of spectators or anyone other than the players. It was equipment "pertaining to the activities of those engaged in physical training or exercise," as those words are used in the *Juntila* case. It was "more or less permanently located equipment," to apply the expression used in the *Briscoe* case, and was certainly not "highly mobile" as the football was there held to be.

Examples of the kind of equipment which are included within the term "athletic apparatus and appliance," are

listed in the *Briscoe* opinion. These are swings, slides, traveling rings, teeter boards and chinning bars. It happens that each of these is used by climbing on, sitting on, or grasping the equipment. No significance is to be attached to this, however, since no question was there presented as to whether the equipment had to be of a kind which is used in this direct manner. A football is also grasped, yet the court held this not to be an athletic apparatus or appliance. The examples listed in the *Briscoe* case were given only for the purpose of drawing a distinction between athletic equipment which is "more or less permanently located" and that which is "highly mobile." The court there made clear, by using the words "such as," that the examples given were not intended to be all-inclusive.

There are expressions in two of our decisions to the effect that the purpose of Rem. Rev. Stat., § 4706, was to exonerate school districts from liability for an accident which occurs *upon* any athletic apparatus or appliance. See *Stovall v. Toppenish School Dist. No. 49, supra; Bush v. Quinault School Dist. No. 97, supra.* The expression in the *Stovall* case is quoted in the recent *Briscoe* case in support of the court's view that the term "athletic apparatus and appliance" refers to equipment which is more or less permanently located.

The *Stovall* case involved an accident in which a school boy fell from a large steel tank which had been disconnected from the school's water system and was about to be carted away. The court held that the tank could not be considered an athletic apparatus or appliance, since it was not play equipment intended to be used in connection with any park, playground or field house. In the *Bush* case, Rem. Rev. Stat., § 4706, was applied to exonerate the school district from liability for injuries sustained when a child fell from exercise bars.

In neither of these cases was the court required to make any distinction between equipment with which the player necessarily comes in contact (such as swings, slides and exercise bars) and equipment which is used in the game but

is not necessarily handled by the players (such as tennis nets, basketball baskets, hockey goals, football goal posts and baseball backstops). In the *Bush* case, this court characterized the exemption provision of Rem. Rev. Stat., § 4706, as "all-embracing."

■ The word "apparatus" means a collection or set of materials, implements, or utensils, for a given work, experimental or operative. *First State Bank of Perkins v. Pulliam*, 112 Okl. 22, 239 Pac. 595; *Salinas v. Pacific Tel. & Tel Co.*, 72 Cal. App. (2d) 494, 164 P. (2d) 905; Webster's New International Dictionary (2d ed.) "apparatus."

■ The word "appliance" is very broad and includes anything applied or used as a means to an end. *Cook v. Big Muddy-Carterville Mining Co.*, 249 Ill. 41, 94 N. E. 90; *Honaker v. Board of Education*, 42 W. Va. 170, 24 S. E. 544, 32 L. R. A. 413, 57 Am. St. 847; *Roberts v. Los Angeles*, 7 Cal. (2d) 477, 61 P. (2d) 323; *Palmer v. Great Northern Ry. Co.*, 119 Mont. 68, 170 P. (2d) 768; Webster's New International Dictionary (2d ed.) "appliance."

■ The baseball backstop in question was used by the players for their convenience in playing the game. It was designed for that purpose. Neither the language of the statute, nor any perceivable legislative objective, nor any of our past decisions, reviewed above, leads us to believe that there is any significance in the distinction respondent makes between this equipment and the kind of athletic equipment which school children use by climbing, swinging or sliding. In our view, this baseball backstop is a playground athletic apparatus or appliance within the meaning of Rem. Rev. Stat., § 4706.

Respondent also argues that, assuming the backstop to be an athletic apparatus or appliance, the statute is not applicable in the instant case, because the injury did not occur upon the equipment and in its use by the student.

The *Stovall* case, *supra*, is cited in support of this contention. In that case the student was injured while playing upon a steel tank which had not been designed for play purposes. No issue was there presented as to whether the

statute applies in the case of injuries sustained by a passerby due to some defect in the apparatus or appliance. The court was concerned with the wholly different question of whether an apparatus or appliance not designed for play purposes, but being actually used for that purpose, falls within the purview of Rem. Rev. Stat., § 4706. In our opinion, the *Stovall* case lends no support to respondent's position.

The statute exonerates school districts with respect to " . . . *any* noncontractual acts or omission of such district, its agents, officers or employees, *relating to* any park, playground, or field house, athletic apparatus or appliance . . . " (Italics ours.)

"Relating to" means in respect to; in reference to; in regard to. *Commonwealth v. Mathues*, 210 Pa. 372, 59 Atl. 961; *In re Water Supply in City of New York*, 109 N.Y.S. 652; Webster's New International Dictionary (2d ed.) "relate."

Had it not been for the backstop there would have been no accident. Every allegation of negligence and all the testimony in support of such allegations directly or indirectly pertained, or had reference, to the condition or use of the backstop. It is therefore plain to us that the "noncontractual acts or omissions" complained of here were all acts or omissions "relating to" the backstop.

There is nothing whatever in the language of the statute indicative of the more restricted scope which respondent urges. In order for us to give the statute the meaning contended for by respondent, we would have to read into the statute the italicized words indicated below:

" . . . relating to *injuries sustained by a person while engaged in using* any park, playground, or field house, athletic apparatus or appliance . . . "

■ We are of the view that Rem. Rev. Stat., § 4706, is applicable in a case such as this, where the injury, caused by the collapse of an athletic apparatus or appliance, is sustained by a passerby who was making no use of the equipment.

In view of the conclusion reached on this branch of the

case, it is unnecessary to consider appellant's other assignments of error.

The judgment is reversed and the cause remanded with instruction to the trial court to dismiss the action.

BEALS, ROBINSON, MALLERY, HILL, and DONWORTH, JJ., concur.

FINLEY, J. (dissenting)—I do not agree with the interpretation of Rem. Rev. Stat., § 4706 [P.P.C. § 862-1], in the majority opinion, which, in effect, overturns the jury verdict and the judgment for plaintiff in the trial court.

The pertinent facts as to how six-year-old Donald Snowden (hereinafter referred to as respondent) was injured are stated in the first several paragraphs of the majority opinion. However, a brief recap here may be helpful.

Respondent, a resident of Kittitas county school district No. 401 (hereinafter referred to as appellant), was a kindergarten pupil in the teachers' training school (hereinafter referred to as model school), of the Central Washington College of Education. His mother had gone to the school to escort the youngster home. Respondent, preceding his mother by several steps, was walking across the corner of the playfield toward the parked family automobile. A short time previously, the sixth grade students, playing baseball during a recess, had lifted from the ground to an upright position a baseball backstop, constructed of lumber and wire, approximately nine feet wide and seven feet high. The supports of the backstop were rotten and weak. The students had been warned not to use it because of its defective condition. The sixth grade teacher apparently was not on the playfield when the backstop (1) had been raised, nor (2) when it was used in connection with the baseball game, nor (3) later, when it was left standing by the sixth grade students of the model school when the bell rang terminating the recess. As Donald, age six, walked past the backstop, it collapsed, falling on him and inflicting painful and serious injuries.

The questions raised in this appeal appear to be as follows:

1. Whether the school district, appellant, could be charged with responsibility for control and operation of the model school and its facilities, including the playfield;

2. Whether the school district, appellant, was negligent with respect to respondent, in that (a) the defective backstop was allowed to remain on the playfield; (b) no proper playground supervision was provided which would have prevented use of the backstop and its being left in the dangerous position that resulted in injury to respondent;

3. Whether Rem. Rev. Stat., § 4706, relieves the school district, appellant, from liability to respondent.

The majority opinion discusses only the third question listed above, and concludes that Rem. Rev. Stat., § 4706, relieves appellant of liability. That disposition of the matter by the majority made a discussion of the first and second questions unnecessary. All three questions seem to be pertinent to this dissent and will be discussed in the order enumerated above.

Now as to the first question above: The state is charged with the duty of providing amply for the education of all children residing within its borders; (sections 1 and 2 of Article IX of our state constitution). The state legislature has entrusted the administration of the public school system to the superintendent of public instruction, the state board of education, the various county superintendents of common schools and the various school district boards of directors (Rem. Rev. Stat., § 4519 [P.P.C. § 861-3]). The state board of education is charged with the duty of preparing study courses and rules for the general government of the common schools (Rem. Rev. Stat. (Sup.), § 4529 [P.P.C. § 903-9]); the county superintendent supervises the activities of the teachers, supervisors and school officials in his county (Rem. Rev. Stat., § 4770 [P.P.C. § 874-7]); the school district boards of directors are responsible for the actual education of the children within their districts. Rem. Supp. 1943, § 4776 [P.P.C. § 883-3], in part, provides:

"Powers and duties of board of directors. Every board of directors, unless otherwise specially provided by law, shall have the power and it shall be its duty:

"First: . . . ⠄⠄⠄ .

"Second: *To enforce the rules and regulations* prescribed by the Superintendent of Public Instruction and the State Board of Education *for the government of schools, pupils and teachers,* and *to enforce the course of study lawfully prescribed for the schools of their districts.*

"Third: *To rent,* repair, furnish and insure *school houses;* to employ janitors, laborers and mechanics.

"Fourth: . . .

"Fifth: To purchase personal property in the name of the district and *to receive, lease,* issue and *hold for their districts any real or personal property.*

"Sixth: . . ." (Emphasis supplied.)

The normal school is a statutory entity separate and distinct from the ordinary garden variety of common schools normally under the control of a school district board of directors. This distinction was pointed out in *School Dist. No. 20 v. Bryan,* 51 Wash. 498, 99 Pac. 28. The statutes of this state, Rem. Rev. Stat., § 4604 [P.P.C. § 898-1] *et seq.,* prescribe the duties or functions of the normal schools. The attention of this court has not been called to any statute, nor to any rule or regulation of the state board of education, which places the responsibility for the education of pupils such as respondent in any normal school or in the officers thereof. Our independent research on this point has failed to disclose any shift of responsibility in this respect from the school districts (common schools) to the normal schools.

Rem. Rev. Stat., § 4611 through 4614 [P.P.C § 898-15 to 898-21], provide the general statutory basis for the model school which respondent attended. Rem. Rev. Stat., § 4611, provides:

"Model and manual training departments. A model school or schools or training departments shall be provided for each state normal school contemplated by this act, in which all students, before graduation, shall have actual practice in teaching for not less than ninety hours under the supervision and observation of critic teachers. All schools or departments provided for herewith shall organize and direct their work in such a manner as shall be in harmony with public schools needs."

This appears to be the basic and pertinent statutory provi-

sion. Other provisions following and supplementary thereto, merely set forth the manner in which pupils are to be selected to constitute the student body of the model school and the manner in which the attendance of students will be reported. The quoted statute indicates that the student-teachers in the normal schools shall be provided ninety hours of practice teaching in a model school. It does not purport to shift the responsibility for the education of the students in the model school from the school district to the normal school.

In this connection, it should be remembered that respondent was a kindergarten pupil. *Nowhere do the statutes* relating to normal schools appear to *authorize the normal school to operate a kindergarten*. Rem. Rev. Stat., § 5096 to 5099 [P.P.C. § 896-1 to 896-7], inclusive, and incidentally § 4805, *definitely do authorize school districts* to establish and maintain kindergartens. Rem. Rev. Stat., § 5096, in part reads:

"Election to authorize establishment. The board of directors of any school district . . . *shall have power to establish and maintain free kindergartens in connection with the common schools of said district* for the instruction of children between the ages of four and six years, residing in said district, and shall establish such courses of training, study and discipline and such rules and regulations governing such kindergartens as said board may deem best." (Emphasis supplied.)

Rem. Rev. Stat., § 5097, in part reads:

"Part of public school system. Kindergartens established under this act *shall be a part of the public school system and under the control and supervision of the regular officers who have charge of the public schools of the state:* . . ." (Emphasis supplied.)

From the above, the conclusion appears to be inescapable that appellant must have been responsible for the operation of the kindergarten attended by respondent and would be bound to exercise ordinary care respecting his well-being.

At this point, we must note that appellant assigned as error the admission into evidence of exhibits 24, 25, 26 and

34, but failed to support this assignment of error with an argument in its brief. This assignment of error will be deemed abandoned. *Devlin v. Department of Labor & Industries,* 194 Wash. 549, 561, 78 P. (2d) 952. It is apparent from the aforementioned exhibits that appellant's predecessor (the Board of Education of District No. 3, Ellensburg) and the predecessor of the Central Washington College of Education (The Washington State Normal School, Ellensburg) recognized some confusion existed respecting statutory powers and duties.

From copies of the minutes of the meetings of the board of trustees of the normal school in 1917 and 1921, we find that in those years the normal school offered appellant the free use of the model school building, and that it was to be operated on the same basis as a common school. The same document reveals that the board of trustees received a copy of a resolution from the appellant in which the offer of the normal school was accepted. A joint method by which the salaries of the teachers in the model school were to be paid was set forth in the respondent's exhibits. In the year 1928, it was agreed by the appellant and the normal school that the model school would be operated jointly by both the normal school and the appellant. This agreement was evidenced by an informal memorandum (Exhibit 34), exchanged between the normal school and the appellant. Thereafter, this joint operation or working arrangement was amended from time to time by an exchange of letters. Mr. Grover L. Putnam, superintendent of schools in 1947 for District No. 401, appellant, testified that the working arrangement between the normal school and the appellant deteriorated; that appellant gradually withdrew from the actual control of the model school; that some time in 1935, and thereafter, appellant ceased asserting its authority over the curriculum of the model school. The superintendent of schools testified that, in his opinion, he did not believe that the appellant was required to withdraw.

At any rate, during the year of the accident—1947—it would appear from the evidence that the authority or con-

trol actually exercised by the appellant over the model school or the students thereof was limited to, (a) the payment of approximately sixty per cent of the salary of the teachers in the model school; (b) the providing of certain services for its pupils, that is, free textbooks, lunches, etc.; and (c) the allocation of children residing in District No. 401, to provide a student body for the model school.

The method of allocating students residing in the district of the model school is significant. Appellant followed the practice of selecting a certain geographical area within School District No. 401. The boundaries of this geographical area were fixed and determined by appellant. Thereupon, all children within the fixed geographical area, irrespective of age or other possible factors, did not attend the regularly constituted schools of appellant School District No. 401. They were allocated to, and required to attend the model school. It does not appear that either the students or their parents decided the matter. Once the allocation was made on the area basis as determined by appellant, that seems to have settled the matter. The students in the selected area, as in the case of respondent, became students of and attended the model school.

Getting back for a moment for an observation respecting the teachers of the model school. The appellant paid sixty per cent of the teachers' salaries; however, it actually acted only as a "rubber stamp" in signing contracts with the teachers already hired by the normal school.

The foregoing being the situation at the time of respondent's injury, it must be admitted that the appellant appeared to be exercising little actual control over the model school, its teachers, its equipment and facilities. However, aside from the matter of appellant's actual control, the problems that concern us now are: First, appellant's right to control the operation of the model school, the work of the teachers and the activities of the students (including respondent and members of the sixth grade); and second, appellant's duty in that regard.

Contrary to appellant's argument that appellant had no

power to enter into any arrangement with the normal school for a joint operation of this model school, we find the provisions of Rem. Rev. Stat., § 4782 [P.P.C. § 883-31], provide, *inter alia,*

" . . . said board, in the name of the district, shall have power to transact all business necessary for maintaining school and protecting the rights of the district."

The right of the appellant to control this model school can be found in this statutory authority plus the original working arrangement between it and the normal school. But over and above the right to control the operation of the model school, appellant had the duty to supervise and control its operation. As stated above, we can find no sanction for a shift to the normal school of appellant's duty to educate children (such as respondent). This is based upon an examination of the constitution and the statutes of our state. It is recognized that in the strictest sense the normal school is not a common school, *School Dist. No. 20 v. Bryan, supra.* But the appellant, having the duty to educate children (such as respondent) and the responsibility for the education and discipline of the sixth grade students, could not entirely avoid its obligations, and abdicate or transfer its powers and duties to the normal school. 2 McQuillin, Municipal Corporation (3rd ed.), p. 668, § 10.38, states:

"Unless authorized by statute or charter, a municipal corporation, in its public character as an agent of the state, cannot surrender, by contract or otherwise, any of its legislative and governmental functions and powers, including a partial surrender of such powers."

Or, as stated in *Stringham v. Union County People's Utility Dist.,* 182 Ore. 565, 568, 577, 178 P. (2d) 698, 187 P. (2d) 150,

" . . . As stated in 1 McQuillin on Municipal Corporation, 2d Ed. Revised, Sec. 393: ' . . . the principle is fundamental and of universal application that public powers conferred upon a municipal corporation and its officers and agents cannot be surrendered or delegated to others,' . . . "

By reason of the foregoing, it seems to follow that, on

March 7, 1947 (the date of respondent's injury), appellant not only had the right to exercise substantial control and supervision over the model school, its students and its facilities used by the students, but it was its duty and responsibility to do so. Having such a duty, appellant cannot now claim that it is not responsible in damages for respondent's injuries because it failed to perform its duties. The evidence in this case justified the jury in reaching the foregoing conclusion. We held in *Billingsley v. Rovig-Temple Co.*, 16 Wn. (2d) 202, 203, 133 P. (2d) 265, that in considering on appeal questions of nonsuit and judgment n.o.v., the evidence should be interpreted most favorably in behalf of the nonmoving party. The legal indicia in this case are sufficiently compelling that the trial court might have decided as a matter of law that appellant owed a duty of care toward respondent. The evidence in the instant case, in my judgment, was sufficient to support the conclusion of the jury that the appellant knew—or should have known—about the defective backstop; that appellant was negligent in not providing proper playground supervision which would have prevented the use of the backstop and its being left in a defective and dangerous condition by the sixth grade students.

In *Briscoe v. School Dist. No. 123*, 32 Wn. (2d) 353, 362, 201 P. (2d) 697, this court indicated that failure to provide proper supervision of physical education or playground activity might constitute negligence on the part of a school district. At page 362, we said:

"The extent of the duty thus imposed upon the respondent school district, in relation to its supervision of the pupils within its custody, is that it is required to exercise such care as an ordinarily reasonable and prudent person would exercise under the same or similar circumstances. *Rice v. School Dist. No. 302*, 140 Wash. 189, 248 Pac. 388; *Eckerson v. Ford's Prairie School Dist. No. 11*, 3 Wn. (2d) 475, 101 P. (2d) 345.

"Applying these rules of law to the facts of the case at bar, we are of the opinion that there is ample evidence from which the jury could have found that the respondent school district was negligent in failing to provide supervision of

the recess play of pupils, especially when it had knowledge of the rough-and-tumble manner in which they were playing keep-away."

Now as to the second or proximate cause question: It is certainly not far-fetched to conclude that it was reasonable on the part of the jury to decide that appellant's negligence was the proximate cause of respondent's injuries. In *Briscoe v. School Dist. No. 123, supra,* at page 364, we said:

" . . . where, as here, the injury results from participation in a group game which the jury could have found was dangerous when played without supervision, we cannot say that the question of proximate cause is anything other than a matter for the jury to decide."

Now as to whether Rem. Rev. Stat., § 4706, relieves appellant of liability: Respondent, the injured kindergarten student, was, in effect, an innocent bystander, a nonactor or a nonuser with reference to "park, playground or field house, athletic apparatus or appliance." Immunity for appellant, nonrecovery by respondent, involving such circumstances, appears to me to be much too harsh a result, one at variance with legislative intent and purpose implicit in the enactment of Rem. Rev. Stat., § 4706, and a result inconsistent with the policy enunciated by this court in previous decisions interpreting Rem. Rev. Stat., § 4706. The statute in question, Rem. Rev. Stat., § 4706, reads:

"Playgrounds—Actions for tort. No action shall be brought or maintained against any school district or its officers for any noncontractual acts or omission of such district, its agents, officers or employees, relating to any park, playground, or field house, athletic apparatus or appliance, or manual training equipment, whether situated in or about any schoolhouse or elsewhere, owned, operated or maintained by such school district."

### Ambiguity—Extrinsic Aids Are Applicable—Search for Legislative Intent Is Justifiable

The statute is ambiguous. Legislative intent should be controlling and the use of extrinsic aids in search of legislative intent would be sound legal doctrine and very pertinently applicable.

In support of the foregoing, the following considerations are pertinent:

(a) The volume and variety of litigation, the number of decisions of this court involving § 4706, are in themselves indicative, and proof of ambiguity.

(b) Analysis of the language of the statute reveals a certain looseness in meaning and considerable lack of clarity. The operative words can be interpreted to confer immunity upon school districts relative to either *six* or *three* things, items, or situations, depending on how the statute is read. In other words, the contemplated immunity from suit could relate to any, (1) park, or (2) playground, or (3) field house, or (4) athletic apparatus, or (5) appliance, or (6) manual training equipment.

On the other hand, and as interpreted and applied in various decisions of this court, the immunity would only relate to three things, (1) athletic apparatus, or (2) appliance, or (3) manual training equipment. In this latter instance, under our decisions, the words "park," or "playground," or "field house" would seem to be interpreted as words of limitation applicable to two items, namely, (a) "athletic apparatus" or (b) "appliance"; the words "manual training equipment" being the third thing or item in the series, would appear to stand alone, perhaps modified, perhaps not, by the words "park" or "playground" or "field house." The latter analysis is outlined in Judge Main's opinion in *Stovall v. Toppenish School District No. 49,* 110 Wash. 97, 188 Pac. 12, 9 A. L. R. 908 (1920). Incidentally the latter more restricted interpretation has been followed in all of the decisions of this court as to § 4706, although the opposite and more expansive interpretation is certainly a possible one. On this basis alone, therefore, the statute is ambiguous.

(c) Section 951, Rem. Code, and § 4706 are statutes *in pari materia.* Therefore, interpretation, construction and a search for legislative intent would certainly be indicated.

(d) Section 951, a territorial enactment, is a *remedial statute* canceling pre-existing common-law immunity of school districts. This territorial statute was continued in

effect by Art. XXVII of the state constitution. Remedial statutes are liberally construed to ". . . subserve the right rather than that which may perpetuate a wrong." *Ingersoll v. Gourley*, 72 Wash. 462, 472, 130 Pac. 743 (1913). Hence, § 951 must be liberally construed in favor of claimants and against immunity for school districts under Rem. Rev. Stat., § 4706.

(e)   Section 4706 must be regarded as an implied repealer respecting § 951. There is a presumption against repeals by implication. 1 Sutherland Statutory Construction (3d ed. Horack), p. 468, § 2014. In other words, an implied repealer, or § 4706, should be strictly construed. Sections 2006 and 2007, p. 454, of Sutherland throw further light on the problem and are quoted, in part, as follows:

"Sec. 2006. The entire problem of determining the extent to which existing legislation is repealed by subsequent statutes ultimately resolves itself into one of legislative intent.

"Sec. 2007. . . .   Thus, in determining whether or not a repeal has been effectuated, the environment, association and character of the statute in its field of operation, the history of previous legislation, the legislative history of the act, and the nature of the defect sought to be remedied by its enactment are all important factors to be considered by the courts. . . ."

The foregoing discussion has related mainly to ambiguity, application of rules of statutory construction and justification of a search for legislative intent as to § 4706. Attention shall now be given to the following:

(a)   INTENT OF LEGISLATURE IN ENACTING SEC. 4706;
(b)   FURTHER DISCUSSION AS TO APPLICATION OF STATUTORY INTERPRETATION RULES

In the *Stovall* case, *supra*, Judge Main referred to the fact that three cases against school districts were pending in the state supreme court at the opening of the legislative session in 1917; that the first bill introduced at the session was one to *amend* Rem. Code, § 951; that the bill as originally introduced employed the legislative draftsmanship device or technique of *amending a pre-existing statute*, the particular amendment being drawn in form of a *proviso* to

be added to Rem. Code, § 951. He points out that the original bill passed the Senate, was rejected by the House, which substituted the language now found in § 4706; that the latter was accepted by the Senate, signed by the governor, and became Rem. Rev. Stat., § 4706, in its present form.

### (a) LEGISLATIVE INTENT AS TO SEC. 4706

Several inferences are to be drawn from the foregoing paragraph discussion. First, the cases of *Bruenn v. Northern Yakima School Dist. No. 7*, 101 Wash. 374, 172 Pac. 569 (1918); *Kelley v. School Dist. No. 71*, 102 Wash. 343, 173 Pac. 333 (1918), and *Holt v. School Dist. No. 71*, 102 Wash. 442, 173 Pac. 335 (1918), referred to by Judge Main as pending at the inception of the legislative session in 1917, all involved situations wherein school districts were being sued because of injuries to school students occurring in the course of use by such students of some so-called athletic apparatus or appliance. To phrase it another way, in each case, there was a user of an instrumentality by a student. The student was an actor, actively using some playground instrumentality. The injuries complained of were caused by, and resulted directly from, contact with and use, or operation by a plaintiff-student of some school playground instrumentality.

Secondly, one further factor might be considered at this point, both with reference to Judge Main's observation and with reference to the 1917 enactment of § 4706. School people at the time were somewhat concerned about potential legal liabilities inherent in the then apparently expanding physical education, athletic and vocational training programs of school districts. There had been some accidents and some law suits, as evidenced by the three cases then pending in the supreme court and other cases mentioned heretofore. In this connection, the following article appeared in the Morning Olympian, Wednesday, March 7, 1917, page 4:

### "WANT SCHOOLS FREE FROM ACCIDENTS

"The county superintendents, in convention at the Methodist Church yesterday, went on record as favoring the bill

that would release the schools from *all liability from acci-dents that happen on the school grounds.* Superintendents Goss of Thurston County and Johnson of Walla Walla County sent the measure to the rules committee of the House of Representatives and a petition was presented to Repre-sentative Aspinwall asking that the bill be put on the House calendar." (Emphasis supplied.)

This last reference is pertinent in indicating that the legislature was not merely acting gratuitously and solely on its own initiative with respect to liability of school dis-tricts under Rem. Code, § 951, but was being actively pe-titioned by county school superintendents; that the county superintendents and the legislature may very well have been considering specifically the factual situations involved in the three cases pending before the supreme court and similar situations involving actual or potential liability in so far as school districts were concerned. In other words, Rem. Rev. Stat., § 4706, was enacted by the legislature to accomplish a specific purpose; and, in a manner of speaking, was directed at a specific evil or problem, namely, *liability* of school districts arising out of the *use* of playground and manual training apparatus, appliance, or equipment, *where injuries resulted to students as actors or users* of such.

### (b) FURTHER DISCUSSION OF APPLICABLE STATUTORY INTERPRETATION RULES

Another point to be made from Judge Main's reference is the fact that the original bill was in the form of an *amend-ment* consisting of a *proviso* to be added to a *pre-existing statute*, whereas the bill as finally enacted employed the legislative technique usually referred to as *implied repealer*. The significant thing in this respect appears to be that dif-ferent legal rules may be applicable relative to statutory interpretation and construction in each of the two types of statutory enactment, since each involves use of a different kind of legislative technique, device or manner of drafts-manship.

Still another point can be made with respect to Judge Main's reference; namely, that the bill as originally drafted

in proviso form contemplated an *absolute immunity* with respect to school districts. It appears to have read as follows:

" 'Provided, however, that no action can be maintained against any school district, when the cause of action is based upon or arises out of any act or acts done or omitted by such school district in its governmental functions.' "

The bill finally enacted into law seems to be much more limited in scope and certainly has been so interpreted by this court.

### Decisions Stake Out Clear-cut Policy Respecting Sec. 4706

Fairly extensive research reveals some sixteen decisions of this court from 1917 to date wherein § 4706 might have been interpreted and construed. It may not be particularly pertinent, but recovery was allowed to injured students in nine of those cases, there being no recovery allowed in seven. It is interesting to note that in the case of *Rice v. School Dist. No. 302*, 140 Wash. 189, 248 Pac. 388, recovery was approved but no reference whatsoever was made to § 4706. It is also interesting to note the policy of the court in the case of *Morris v. Union High School Dist. A*, 160 Wash. 121, 294 Pac. 988, where no reference was made to § 4706 in the majority opinion; Holcomb, J., made note of that fact and aggressively attempted to direct the court's attention to the statute in a strongly worded dissent.

Running through the sixteen cases since the enactment of § 4706: The court appears to have slowly and cautiously worked out a very clear-cut policy. In the bulk of the cases, the court seems to have felt that the statute was ambiguous, and has not hesitated to use extrinsic aids and to search for legislative materials in seeking to determine the intent of the legislature in enacting the statute. In other words, throughout the series of cases, the court, with little reluctance, has engaged in statutory interpretation and construction in an effort to determine the meaning and application of the statute. The policy established seems to be a clearcut one of strict interpretation and application of the statute,

limiting immunity fairly consistently to situations involving a *user* of athletic or manual training apparatus, or appliance, or equipment. In situations involving a *nonuser* of athletic apparatus, or appliances, or manual training equipment, where a student has been a *nonactor*, negligence being imputable to the school district, the court has always denied immunity and permitted recovery. At one point in the judicial history of the statute, the court was almost too sympathetic in denying immunity to a school district and in sustaining the claim of an injured student. That was in the case of *Bowman v. Union High School Dist. No. 1*, 173 Wash. 299, 22 P. (2d) 991 (1933), which subsequently was overruled squarely in the case of *Casper v. Longview School Dist. No. 122*, 5 Wn. (2d) 403, 105 P. (2d) 503 (1940), the court, referring back to the case of *Swanson v. School Dist. No. 15*, 109 Wash. 652, 187 Pac. 386 (1920), indicating the reasoning and the decision of the *Swanson* case should have prevailed in the *Bowman* case.

It seems to the writer that the decisions of this court with respect to the statute strongly imply ambiguity; that throughout those decisions the court has resorted to extrinsic aids, legislative history, interpretation and construction; that the court has, over a period of years, slowly and cautiously staked out a policy approving immunity in situations involving a user of athletic or manual training instrumentalties, but has been equally cautious in outlining a clear-cut policy of nonimmunity in cases involving a *nonuser* of athletic apparatus and appliance, or manual training equipment. In support of this analysis, a chronological listing and thumb-nail brief of nineteen decisions of this court, relating to interpretation and application of Rem. Rev. Stat., § 4706, is set out as follows:

(a) Cases Decided Prior to Enactment of § 4706

TITLE. *Redfield* (1907), 48 Wash. 85 (Dunbar, J.)
NON-USER, NON-ACTOR situation; recovery allowed.
DIGEST. Bucket of hot water used in connection with heating apparatus of schoolroom overturned, scalding student. Judgment of dismissal reversed, and cause remanded with instructions to overrule demurrer,

holding district liable for negligent acts and omissions of officers or agents.

TITLE. *Howard* (1915), 88 Wash. 167 (Ellis, J.)
USER, ACTOR situation; recovery allowed.

DIGEST. Injuries sustained by six-year-old girl student in falling from a play ladder to unpadded cement floor and breaking her arm. Ladder was not intended for use of small children; student was unsupervised and voluntarily playing on equipment in basement when injured. Held district liable under § 951 for negligence in maintainance of dangerous ladder in playroom. Rule of *stare decisis* applied.

## (b) Cases Decided After Enactment of § 4706

TITLE. *Bruenn* (April 25, 1918), 101 Wash. 374 (Main, J.)
USER, ACTOR situation; recovery allowed. (Case arose before
§ 4706 was effective.)

DIGEST. Appeal from judgment upon verdict of jury in favor of eight-year-old boy who was injured while playing on teeter board that had been removed from usual location to a swing; when school bell rang, the other pupils jumped off, and descending teeter board struck him on ankle. Accident had occurred in 1914; verdict entered in 1916. Held case had gone to judgment prior to effective date of § 4706, which, therefore, did not apply. Recovery allowed.

TITLE. *Foley* (Apr. 30, 1918), 102 Wash. 50 (Per Curiam)
USER, ACTOR situation; recovery denied. (Case arose after
§ 4706 was effective.)

DIGEST. In use of swimming pool, student drowned. Judgment for school district entered June 1, 1917, which was after effective date of §.4706. Held the case fell under the bar of the 1917 act.

TITLE. *Kelley* (May 10, 1918), 102 Wash. 343 (Fullerton, J.)
USER, ACTOR situation; recovery allowed. (Case arose before
§ 4706 was effective.)

DIGEST. Injuries sustained by nine-year-old child when swing broke. Held district negligent. § 4706 cited in opinion as having been passed while appeal was pending, held not applicable.

TITLE. *Holt* (May 11, 1918), 102 Wash. 442 (Parker, J.)
USER, ACTOR situation; recovery allowed. (Case arose before
§ 4706 was.effective.)

DIGEST. Action for personal injuries sustained by nine-year-old girl when she fell from playground slide. Accident happened in 1916. The *Bruenn* case cited. Held act of 1917 did not apply. Plaintiff's judgment affirmed.

TITLE. *Bailey* (1919), 108 Wash. 612 (Mackintosh, J.)
USER, ACTOR situation; recovery denied.

DIGEST. Personal injuries sustained by pupil in 1916, while using certain playground apparatus. Held, in affirming lower court, § 4706, giving immunity to school districts, applied.

TITLE.  *Swanson* (Jan. 28, 1920), 109 Wash. 652 (Main, J.)
USER, ACTOR situation; recovery denied.
DIGEST.  Pupil seriously injured in using a circular saw maintained and operated in manual training department.  Held act of 1917 not unconstitutional, and was applicable.  (Affirmed in *Casper* case, 5 Wn. (2d) 403.)

TITLE.  *Stovall* (Mar. 1, 1920), 110 Wash. 97 (Main, J.)
NON-USER, NON-ACTOR situation.
No·athletic apparatus or appliance involved; recovery allowed.
DIGEST.  Verdict of jury rendered in favor of eight-year-old student when he fell off a steel tank left on school grounds after repairs to school building.  Held § 4706 was only to exonerate school districts from liability for an accident which occurs upon any athletic apparatus or appliance or manual training equipment *used* in connection with any park, playground, or field house owned or maintained by the district.  Judgment affirmed.

TITLE.  *Rice* (1926), 140 Wash. 189 (Mitchell, J.)
NON-USER, NON-ACTOR situation.
No athletic apparatus or appliance involved; recovery allowed.
DIGEST.  Eleven-year-old pupil injured while playing on school grounds.  Antenna strung across grounds for P.T.A. radio entertainment broke, fell on high voltage wires, and student received electric shock.  Held district negligent.  No reference made in opinion to § 4706.

TITLE.  *Morris* (1931), 160 Wash. 121 (Main, J.)
NON-USER, NON-ACTOR situation respecting athletic
apparatus or appliance; recovery allowed.
DIGEST.  Minor was "induced, persuaded, and coerced" to engage in a football game when he was physically unfit to participate, as the coach should have known.  Held district liable, and reversed judgment.  No reference made to § 4706.

TITLE.  *Bowman* (1933), 173 Wash. 299 (Mitchell, J.)
USER, ACTOR situation; recovery allowed.  (Subsequently overruled.)
DIGEST.  Action for loss of three fingers by student while operating a defective planer as part of his high school manual training work.  Held district liable, under § 4706, for maintaining a planer without guard, and cause remanded with direction to overrule demurrer.
(*Overruled* in *Casper* case, 5 Wn. (2d) 403.)

(1)
TITLE.  *Juntila* (1934), 178 Wash. 637 (Main, J.)
NON-USER, NON-ACTOR situation respecting specific athletic
apparatus or appliance; recovery allowed.
DIGEST.  Injuries sustained by student occupying a bleacher seat on athletic field maintained by school district, when guard rail at the back of last or top row of seats broke, and, as a result, he fell many feet to the ground.  Held bleacher seats in an athletic field were for use of spectators and not "an appliance" within § 4706.  Cause remanded with direction to overrule demurrer.

(2)

TITLE. *Juntila* (1935), 183 Wash. 357 (Geraghty, J.)
NON-USER, NON-ACTOR situation, but contributory negligence; recovery denied.

DIGEST. Minor child injured as set forth in first *Juntila* case. Held that boy of eighteen was guilty of contributory negligence, and recovery denied on that basis.

TITLE. *Bush* (1939), 1 Wn. (2d) 28 (Millard, J.)
USER, ACTOR situation; recovery denied.

DIGEST. Pre-school child climbed a ladder to the top of a horizontal bar, became frightened and fell, injuring herself. Held that § 4706 applied.

TITLE. *Casper* (1940), 5 Wn. (2d) 403 (Blake, J.)
*En Banc*
USER, ACTOR situation; recovery denied.

DIGEST. Wrongful death of son resulting from the negligent maintenance and operation of manual training equipment. All concurred in opinion remanding cause with direction to dismiss under provisions of § 4706.

(Affirmed the *Swanson* case and overruled the *Bowman* case.)

TITLE. *Read* (1941), 7 Wn. (2d) 502 (Simpson, J.)
NON-USER, NON-ACTOR situation respecting athletic appliance or apparatus, but no negligence by district; recovery denied.

DIGEST. Minor sustained injuries while engaged in playing too roughly in school gymnasium during a physical education class period. No reference made to § 4706, but no negligence by school district. Judgment reversed.

TITLE. *Yarnell* (1943), 17 Wn. (2d) 284 (Beals, J.)
USER, ACTOR situation; recovery denied.

DIGEST. Seven-year-old pupil became frightened and fell from a swing. Held that § 4706 applied.

TITLE. *Briscoe* (1949), 32 Wn. (2d) 353 (Steinert, J.)
NON-USER, NON-ACTOR respecting specific, permanently located athletic appliance or apparatus; recovery allowed.

DIGEST. Personal injuries sustained by eleven-year-old boy while playing game of "keep away" football with other pupils. Held § 4706 refers to more or less permanently located equipment, did not apply to factual situation here involved.

Pursuant to the above discussion, it is my firm opinion that Rem. Rev. Stat., § 4706, does not confer immunity upon appellant school district under the pertinent operative facts in this case. In view of the circumstances in the instant case, I do not conceive it to be a function or proper duty of the appellate court to substitute its judgment for that of the

trial judge, and the jury of twelve good citizens and true; or to perform the function of either in a manner different than was done in the trial court. For the latter reason, particularly, and in view of the foregoing discussion disposing of the three crucial questions favorably in so far as respondent is concerned, the logical conclusion is reached, and it is my conviction that the judgment of the trial court should be affirmed.

GRADY, J. (dissenting)—I concur with Judge Finley upon questions (1) and (2) with reference to the liability of appellant.

My study of Rem. Rev. Stat., § 4706, leads me to the conclusion that it is ambiguous and the interpretation of it by the majority opinion is too broad. The statute was enacted in 1917. Prior to that time, school districts had adopted extensive programs with reference to athletic activities for pupils. Manual training departments in the schools had been established. Accidents were happening, and because of existing statutes school districts were being held liable. Many people believed that athletic and manual training activities should be encouraged, but in order to do so it would be necessary to relieve school districts from liability to pupils who might be injured while using the instrumentalities provided therefor. Places of recreation for pupils such as parks, playgrounds, and field houses were maintained by school districts. Athletic and manual training activities were in many instances carried on at places provided other than in school buildings or on the grounds adjacent thereto. The statute does not in any way define what noncontractual acts or omissions may be said to *relate* to a park, playground, or field house. It does not state whether the immunity from liability is limited to school attendants, for whom such places and facilities are provided and maintained, or whether it covers the general public or persons with whom a school district may have business or other lawful transactions in connection with the places or instrumentalities maintained.

A statute purporting to create an immunity from liability should be strictly construed, and in case of doubt it should be limited to the supposed evil it sought to correct. We did so when we decided the case of *Stovall v. Toppenish School Dist. No. 49,* 110 Wash. 97, 188 Pac. 12. In that case we said:

"It seems clear that the purpose of the legislature was to exonerate school districts from liability for an accident which occurs upon any athletic apparatus or appliance or manual training equipment which is used in connection with any park, playground, or field house, owned or maintained by the district."

In that case, liability was based upon the fact that the pupil had been playing upon something not covered by the statute, but which was dangerous and had been negligently allowed to be and remain on the school playground by the district. I think the same principle should apply to the situation before us. The backstop is being regarded as an athletic apparatus, but the pupil was not playing upon or using it. He was on his way from the school building to the highway, and as he passed by the backstop it collapsed and injured him. I am therefore of the opinion that the statute does not apply and that the appellant should be held liable.

SCHWELLENBACH, C. J., concurs with GRADY, J.